In the Matter of Victoria Karlinski, as Administratrix of the Estate of Alois Karlinski, Deceased, Petitioner.*

Surrogate's Court, Erie County, December 11, 1942.

* See, also, *Matter of Deyo*, 180 Misc. 32.—[Rep.

*Kent Christy* and *Morey C. Bartholomew* for petitioner.

*Edmund P. Radwan* for Jean K. Sandacz and Theodore Karlinski, respondents.

*George L. Grobe, United States Attorney for the Western District of New York,* for United States Government, on motion for leave to intervene.

*Dana B. Hellings* and *Morey C. Bartholomew* for petitioner, on reargument.

*Francis M. Shea, United States Assistant Attorney-General, George L. Grobe, United States Attorney for the Western District of New York (Sidney J. Kaplan, Special Assistant to the Attorney-General, and Martin Norr, Attorney, Department of Justice,* of counsel), for United States Government, on reargument.

VANDERMEULEN, S. Alois Karlinski died in the city of Buffalo, New York, on July 7, 1942. Thereafter, letters of administration were issued to his wife, Victoria Karlinski.

The deceased, during his lifetime, purchased a number of United States Savings Bonds, which were made payable, in the event of his death, to Theodore Karlinski, his brother. These were kept in the safe of the plumbing establishment of Karlinski Brothers, of which firm the deceased was a member. He at all times had access to the contents of the safe.

I hold these bonds are the property of the estate and should be delivered to the administratrix herein. (See *Decker* v. *Fowler,* 199 Wash. 549; *Deyo* v. *Adams,* 178 Misc. 859.)

A decree may be submitted immediately providing that the said bonds be delivered to Victoria Karlinski, administratrix of the estate herein.

During his lifetime, the deceased and his brother, Raymond Karlinski, carried on a plumbing and heating business under the assumed name of Karlinski Brothers, pursuant to a written partnership agreement introduced in evidence. The agreement has the customary provisions that are usually found in such contracts. Paragraph " 9½ " states, however: " In the event of the death of the party of the first part (Al. B. Karlinski) prior to the termination of this partnership, the second party (Raymond Karlinski) shall become the sole owner of the partnership."

The administratrix claims that the personal property and records of the deceased and the books, papers and records of such business are under the control and in the possession of Theodore Karlinski and Jean Karlinski Sandacz, brother and sister respectively of said decedent, and of said Raymond Karlinski, who is now in the armed forces of the United States. The last named has given a power of attorney to Jean Sandacz.

Although it is not quite clear in the paragraphs of the petition that the petitioner claims the estate has an interest in the property of the partnership, nevertheless the prayer for relief in part reads as follows: " that they be directed to deliver said property if in their control or pay the proceeds or the value thereof and that the petitioner have such further relief as in the premises may be just." From this I gather the petitioner, as administratrix, claims an interest in the assets of the partnership.

This brings before the court, insofar as the partnership is concerned, the question whether this agreement was an attempt to dispose of the interest of the deceased by an instrument testamentary in character, but not executed in accordance with the formalities required by the Decedent Estate Law of the State of New York.

The following, quoted from 1 Davids, New York Law of Wills, section 443, indicates the view of the courts: " It may not be inaccurate to say that the courts, with a view to preservation of the integrity of the Statute of Wills, will refuse to recognize and enforce any arrangement or transaction which is the equivalent of a testamentary disposition, and which was intended to operate as a substitute or subterfuge for a will or testament. If an instrument of writing is in fact testamentary in character, but was not executed in accordance with the requirements relating to wills, it will not be enforced, although it may purport to be an instrument of another sort."

In the case of *McKinnon* v. *McKinnon* (56 F. 409 [1893], revg. 46 F. 713) the articles of partnership between an uncle and nephew for the practice of medicine provided that, in the event of the death of the senior member of the firm, all his property, personal and otherwise which he held in partnership at the time of his death, should go to the junior partner, J. A. McKinnon, provided the senior member leave no family of his own and that, should the junior partner die before the termination of the partnership, his share of the partnership property be administered upon according to his express wishes or, in the absence of that, according to the wishes of the senior mem-

ber (M. McKinnon) provided J. A. McKinnon leave no family of his own to inherit his property.

The court said at page 412 (*supra*) : " We can conceive of no sufficient reason why an agreement contained in partnership articles, to the effect that in a certain contingency, one of the partners shall succeed to all of the partnership assets, should not be held valid, and should not be specifically enforced in equity when the contingency happens, if an agreement such as we have last referred to is held to be valid and enforceable, as it certainly is in the state where this controversy had its origin. Under such an arrangement between partners the one in whom the right of survivorship is thus vested, would hold all of the partnership assets, subject to the payment of the partnership debts, as he would in any event; and we are not aware of any considerations which should preclude the making or the enforcement of such an agreement."

There are a number of cases in this State upholding the validity of a partnership agreement determining the methods and terms of the disposition of the interest of the partners in the partnership upon the death of either. (*Matter of Mildrum,* 108 Misc. 114; *Smith* v. *Furst,* 186 App. Div. 452; *Matter of Columbia Trust Co.,* 169 App. Div. 822; *Sands* v. *Miner,* 16 App. Div. 347; *Hermes* v. *Compton,* 260 App. Div. 507; *Corr* v. *Hoffman,* 256 N. Y. 254.)

In *Murphy* v. *Murphy* (217 Mass. 233) the partnership agreement was upheld wherein the deceased partner agreed during his lifetime that, upon payment of $3,000 to the widow by the other partner after the death of the decedent, the surviving partner should become the sole owner of the business.

The court said at page 235 : " Partnership agreements which provide for the conduct of the business after the death of one or more of the partners, and for the disposition of the interest of partners in the partnership in such event, are frequent. See *Williams* v. *Brookline* (194 Mass. 44.) When fairly made, without any illegal purpose and without the intent to evade the statute of wills, they are not open to objection. Contracts respecting the disposition of one's property after death are not uncommon. See, for example, *Krell* v. *Codman,* 154 Mass. 454, and *Howe* v. *Watson,* 179 Mass. 30. There are sound reasons why a fair agreement entered into by partners, as to the disposition of partnership property in the event of the death of one or more of the partners, should be sustained. The terms of such an agreement made by those most familiar with the real character and value of the property, are quite as likely

to be just as an arrangement made after the decease. The contract at bar was executed upon a valid consideration, and, having been found expressly not to have been intended as a testamentary disposition, must be upheld.''

The instant case differs from the cases I have examined, some of which I have quoted in this opinion, in that there is no mention of any specific amount to be paid for the interest in the partnership nor any specific reciprocal arrangement between the partners. This brings up the question of consideration. Is there a lack of consideration which destroys the validity of this particular part of the agreement?

It appears to me that in view of the courts' generally sanctioning as a matter of law these agreements, it is immaterial whether the transfer of partnership embodies a money payment, a reciprocal arrangement, or a mere naked transfer by one to the other.

It was ruled in *McKinnon* v. *McKinnon* (*supra*) that the clause of the agreement under discussion was not a mere gratuity which rested upon no consideration, but rather rested upon the same meritorious consideration that supported the other provisions of the partnership articles, which, it was said, consisted of the mutual promises of the parties to become partners and to conduct the partnership business on the terms mentioned in the partnership agreement.

It further appears to me that in the absence of proof that the contract was intended to operate as a substitute or subterfuge for a will, and made for the purpose of defeating the right of the widow under section 18 of the Decedent Estate Law, the interest of the decedent in the partnership belongs to the surviving partner.

However, I do not wish to foreclose the administratrix from producing proof as to the intent of this clause, if she has any to offer. I will therefore keep the matter open until January 4, 1943, for this purpose. If on or before this date no effort is made to offer such proof, or if the parties consent before this date, decree may be submitted and entered, adjudging the ownership and title to the partnership to be in Raymond Karlinski.

(On motion for leave to intervene, March 1, 1943.)

A decision was rendered by this court in the above-entitled matter adjudging certain savings bonds of the value of $150 the property of the estate herein. Both the secondary beneficiary named in the bonds and the estate were represented by counsel. No decree has as yet been signed. The United States

Government was not a party to the proceeding and was not represented at any stage of it. It now appears there is a question which involves the financing of the war effort. The United States Government seeks " Leave to appear for the purpose of filing ' Suggestion of the interest of the United States in the matter in litigation ' and of asserting such interest and attending thereto, and for leave to file the suggestion "; briefly speaking, the right to intervene.

I believe in fairness to the purchasers and prospective purchasers of savings bonds that the Federal Government should have its day in court and be heard. If it convinces me of the tenability of its position, namely, that the United States Government in the exercise of its power to borrow money through the sale of war bonds is not subject to the law of the State of New York governing the disposition and distribution of the property of deceased persons, I will not hesitate to change my decision.

The matter may be argued March 5, 1943, at 2 p. m.

(On reargument, June 25, 1943.)

Victoria Karlinski, as administratrix of the estate of Alois Karlinski, who died July 7, 1942, instituted an inquiry proceeding for the purpose of discovering personal property allegedly belonging to the deceased and wrongfully withheld by one Theodore Karlinski, brother of the deceased. This property included five United States Savings Bonds, series E-1942, with an approximate total maturity value of $150. The bonds were registered in the form " Alois B. Karlinski, payable on death to Theodore H. Karlinski."

In an opinion dated December 11, 1942, this court held that the bonds, along with other property, belonged to the estate rather than to the named beneficiary. The United States Government was not a party to the proceeding. Thereafter, and prior to the entry of a final decree, the government became aware of the pendency of the suit and, asserting that the obligations and interests of the United States were involved, the United States Attorney for the Western District of New York, by direction of the Attorney-General, moved for leave to appear herein for the purpose of filing " Suggestion of the Interest of the United States in the Matter in Litigation," and of asserting such interest and attending thereto, and for leave to file the suggestion. The United States Attorney also moved for a reconsideration of the decision of December 11, 1942, insofar as it related to United States Savings Bonds. Both motions were granted and briefs were submitted to the Surrogate.

The statute authorizing the issuance of savings bonds provides, in part, as follows: "The Secretary of the Treasury, with the approval of the President, is authorized to issue, from time to time, through the Postal Service or otherwise, United States savings bonds and United States Treasury savings certificates, the proceeds of which shall be available to meet any public expenditures authorized by law, and to retire any outstanding obligations of the United States bearing interest or issued on a discount basis. The various issues and series of the savings bonds and the savings certificates shall be in such forms, shall be offered in such amounts, subject to the limitation imposed by section 757b of this title, and shall be issued in such manner and subject to such terms and conditions consistent with subsections (b), (c), and (d) hereof, and including any restrictions on their transfer, as the Secretary of the Treasury may from time to time prescribe." (Second Liberty Bond Act, § 22, U. S. Code, tit. 31, § 757c, added Feb. 4, 1935, amd. Feb. 19, 1941.)

Each bond of the bonds in question, on its face, adopts as controlling "the regulations prescribed from time to time" by the Secretary of the Treasury. Moreover, the circulars under which all the bonds here involved were issued, which circulars were incorporated by reference on the face of the bonds as a statement of their terms, provided that all bonds issued pursuant thereto "shall be subject to the regulations prescribed from time to time by the Secretary of the Treasury to govern United States Savings Bonds." By reason of the foregoing provisions the controlling regulations are those which were in force at the time of decedent's death.

Those regulations, Treasury Department Circular No. 530, Fifth Revision, dated June 1, 1942 (7 Federal Register 5158), read in part as follows with reference to bonds, like those here involved, registered in the beneficiary form: "Sec. 315.34. *Payment to registered owner.*— A bond registered in the name of one person payable on death to another, for example, ' Henry W. Ash, payable on death to John C. Black ', will be paid to the registered owner during his lifetime upon his properly executed request as though no beneficiary had been named in the registration."

"Sec. 315.36. *Payment or reissue to beneficiary.*— If the registered owner dies without having presented and surrendered the bond for payment or authorized reissue to a Federal Reserve Bank or the Treasury Department, and is survived by the beneficiary, upon proof of such death and survivorship,

the beneficiary will be recognized as the sole and absolute owner of the bond, and it will be paid only to him, or may be reissued in his name alone, or otherwise reissued in accordance with Subpart J as though it were registered in his name alone: *Provided, however,* That if the bond with a properly executed request by the registered owner for payment or authorized reissue has actually been received by a Federal Reserve Bank or the Treasury Department, payment of the bond, or check, if one has been issued, will be made to the estate of the deceased owner in accordance with Sec. 315.49.''

The bonds were issued under section 757 of title 31 of the United States Code (amd. February 19, 1941). Regulation 315.8 provides: '' Sec. 315.8. *Not transferable.* United States Savings Bonds are not transferable and are payable only to the owners named thereon except in case of the disability or death of the owner or as otherwise specifically provided herein, but in any event only in accordance with the provisions of these regulations. Accordingly, savings bonds may not be sold or hypothecated as collateral for a loan and may not be used as security for the performance of an obligation except as expressly provided in these regulations.''

The United States Government claims that the bonds in question are the property of Theodore Karlinski, the named beneficiary therein. In taking this position, the government asserts that the United States Treasury Department has by its regulations the authority to create new property rights in the bond, separate and uncontrolled by State law. The estate of Alois Karlinski maintains that the bonds must be disposed of in accordance with the laws of New York State.

This court does not question the authority of the Secretary of the Treasury to promulgate regulations which have the force and effect of law. (See *Maryland Casualty Co.* v. *United States,* 251 U. S. 342.) But there must be a limit to the extent of a regulation, else a governmental department could substitute itself for Congress. Congress is the voice of the people and not a governmental department or bureau.

The State of New York has by statute provided that: '' All persons, except idiots, persons of unsound mind and infants, may devise their real estate, by a last will and testament, duly executed, according to the provisions of this article.'' (Decedent Estate Law, § 10.)

Section 21 of the same law provides the statutory requirements necessary to constitute an instrument a valid will.

Section 83 provides the manner of distribution in the event of failure to make a will.

An instrument, testamentary in character, and not having been executed with the formalities of a will, is void. (*Butler* v. *Sherwood*, 196 App. Div. 603; *McCarthy* v. *Pieret*, 281 N. Y. 407.)

The attempted disposition of the bonds in question by means of the clause in the bond, " Alois Karlinski, payable on death to Theodore Karlinski," is testamentary in character, not executed with the formalities of a will and is void unless the Treasury Department had the proper authority under the Constitution of the United States of America to insert this clause in the bond and give it more of an effect than a regulation of transfer determining to whom the government may make payment and thereby relieve itself of suits and claims or controversies. In other words, can the Treasury Department by virtue of its regulations, contained in Treasury Department Circular No. 530, Fifth Revision, dated June 1, 1942 (7 Federal Register 5158), create an absolute property right either to the bonds or their proceeds in the hands of a beneficiary as specified in the regulations?

The following cases hold that the regulations were not intended to create absolute property rights, either to the bonds or the proceeds in the hands of a beneficiary as specified in the regulations, and that the law of the State determines the beneficiary's right to the proceeds of the bonds: *Decker* v. *Fowler* (199 Wash. 549); *Dietzen* v. *American Trust & Banking Co.* (175 Tenn. 49); *Sinift* v. *Sinift* (229 Iowa 56); *Deyo* v. *Adams* (178 Misc. 859).

Certainly it can logically be stated that Congress has no power to declare statutory rules governing property rights applicable in a State.

There is the following terse statement in *Morgan* v. *Commissioner* (309 U. S. 78 at p. 80): " State law creates legal interests and rights."

This court has been unable to find any decisions of the Supreme Court squarely on the question of whether clause 2 of section 8 of article I of the United States Constitution authorizes Congress to create new property rights not subject to State law regulating property rights among its own citizens.

A dictum in *Frew* v. *Bowers* (12 F. 2d 625) indicates that Congress may not do so. There the court held that under the Revenue Act of 1921, a decedent's estate could not be taxed for a gift made in 1910 to a trust of which he was life beneficiary, on the theory that it was. a gift intended to take effect at death. Judge Hough writing the opinion of the court said

at page 628: " The statute does not pretend to declare ownership, and it could not if it would; for the right to own property, grant it, and dispose of it by will is a matter for the states, and not the nation * * *."

In *Erie R. R. Co.* v. *Tompkins* (304 U. S. 64) Mr. Justice BRANDEIS said: " Congress has no power to declare substantive rules of common law applicable in a State whether they be local in their nature or ' general,' be they commercial law or a part of the law of torts."

The case of *Blair* v. *Commissioner* (300 U. S. 5) presented the question of the liability of a beneficiary of a testamentary trust for a tax upon the income which he had assigned to his children prior to the tax years and which the trustees had paid them accordingly. In the opinion, Chief Justice HUGHES stated at page 9: " The question of the validity of the assignments is a question of local law. The donor was a resident of Illinois and his disposition of the property in that State was subject to its law. By that law the character of the trust, the nature and extent of the interest of the beneficiary, and the power of the beneficiary to assign that interest in whole or in part, are to be determined. The decision of the state court upon these questions is final. *Spindle* v. *Shreve,* 111 U. S. 542, 547, 548; *Uterhart* v. *United States,* 240 U. S. 598, 603; *Poe* v. *Seaborn,* 282 U. S. 101, 110; *Freuler* v. *Helvering, supra,* p. 45."

The case of the *United States* v. *Fox* (94 U. S. 315), although involving solely real property, laid down a principle that can well be applied to the instant situation and clearly demonstrates the attitude of the court respecting the power of the State. It was said at page 320: " The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a testamentary disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated. *McCormick* v. *Sullivant,* 10 Wheat. 202. The power of the State in this respect follows from her sovereignty within her limits, as to all matters over which jurisdiction has not been expressly or by necessary implication transferred to the Federal government. The title and modes of disposition of real property within the State, whether *inter vivos* or testamentary, are not matters placed under the control of Federal

authority. Such control would be foreign to the purposes for which the Federal government was created, and would seriously embarrass the landed interests of the State.''

In *Matter of D'Adamo* (212 N. Y. 214) Justice CARDOZO repeatedly stated that the Federal government has no power to impose regulations that might intrude upon the sovereignty of a State.

Among the number of cases cited by the Unied States Treasury Department there are the following five upon which it places strong reliance in support of its contention and which this court now discusses: *Warren* v. *United States* (68 Ct. Claims 634 [1929], certiorari denied, 281 U. S. 739); *Irvine* v. *Marshall* (20 How. 558); *Ruddy* v. *Rossi* (248 U. S. 104); *United States* v. *Sacks* (257 U. S. 37); *United States* v. *Janowitz* (257 U. S. 42).

It will be noted in *Warren* v. *United States* (*supra*) the executrix sued the United States on Treasury savings certificates in her possession as executrix, which the Secretary of the Treasury refused to pay on demand. Decedent had purchased the certificates and had them issued '' James Vinson Wiggins, payable in case of death to Robb R. Rankin.'' The regulations provided that the bonds were not transferable and would be paid to the owner on demand. The executrix claimed that the regulations were illegal in that the Treasury Department '' would not have the power or authority to make rules and regulations which would have the effect of passing the title to property in the State of Texas, and that the question as to the title and ownership of said certificates and the proceeds thereof, as herein stated, is controlled by the laws of the State of Texas.'' (There had been no delivery of the bonds to the beneficiary during decedent's lifetime.) In dismissing plaintiff's petition, the court pointed out that the case was a suit on a contract entered into between decedent and the United States, under which the United States had agreed to pay the beneficiary named under certain conditions. The court held that the Secretary could refuse to pay the estate under the contract because under that contract it was payable to the beneficiaries.

The above case merely held that the United States can not be compelled to make payment of a bond to anyone other than the person specified by the controlling regulations. It by no means decided that the United States Government could create a property right in derogation of the laws of the State.

The case of *Irvine* v. *Marshall* (*supra*) involved public lands owned by the United States Government. There is a clear distinction between the case of government lands and

government obligations. Over a long period of years, Congress by statute has evidenced its public policy relating to the sale of such lands and its retention of. ownership therein until the patent finally issued. In the case of government obligations there has been no such expression of Congressional purpose to establish special rights in government bonds or their proceeds when paid.

The case of *Ruddy* v. *Rossi* (*supra*) involved the applicability of section 4 of the Homestead Act which provided: " No lands acquired under the provisions of this act shall in any event become liable to the satisfaction of any debt or debts contracted prior to the issuing of the patent therefor."

Congress has specifically provided that lands acquired from the government should not become liable for the satisfaction of any debt contracted prior to the issue of the patent.

In similar situations, when lands acquired from the United States were held exempt from State law, Congress itself had enacted such exemption. (See *Mahnomen County* v. *United States,* 131 F. 2d 936, and cases cited therein; certiorari granted March 15, 1943, 318 U. S. 752, revd. 318 U. S. 474, decided June 7, 1943.)

The *Sacks* and *Janowitz* cases merely hold that a power granted to the Secretary to prescribe the terms and conditions of government bonds includes the power to restrict their transfer. The cases do not hold that the Secretary, in the absence of Congressional action, may by regulation affect rights of ownership in the proceeds of the bonds when paid. It seems clear that a restriction on transferability is a term or condition of the obligation issued, whereas. a regulation fixing property rights in the proceeds at the time of receipt by the payee is not a condition of the obligation and transcends the power conferred by Congress.

While it is true that it is within the power of Congress to authorize an executive department to fill up the details by rules and regulations, as was stated in *Currin* v. *Wallace* (306 U. S. 1), nevertheless that doctrine requires that Congress shall have set forth the general policy in the statute. There is no legislative determination here of a policy to create new property rights in government securities or their proceeds. Any rule or regulation not within the framework of a policy defined by Congress is invalid as an exercise of the legislative power which Congress is forbidden to abdicate or to transfer.

In *United States* v. *Grimaud* (220 U. S. 506), the court had before its consideration the violation of the rules and regula-

tions promulgated by the Secretary of Agriculture. It held that the demurrers to the indictment should have been over-ruled because the statute and not the Secretary of Agriculture fixed the penalty. Conversely, it is safe to say that if the Secretary had fixed the penalty, and not Congress in its enactment of the statute, the demurrers would have been sustained.

The court said at page 520 (*supra*), quoting from *Field* v. *Clark* (143 U. S. 649, 694): "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make its own action depend."

The Secretary of the Treasury can no more create a property right than he can provide punishment for the violation of a law.

The case of *Panama Refining Co.* v. *Ryan* (293 U. S. 388) involves a section of the National Industrial Recovery Act of 1933. The Act authorizes the President to prohibit the interstate transportation of petroleum in excess of any amount permitted by any State law or regulation thereunder and the President issued the appropriate executive order authorizing the Secretary of the Interior to promulgate regulations. The court held that the Act was an unconstitutional delegation of legislative power because the statute failed to declare any legislative policy respecting the transportation of excess petroleum produced.

What this court desires to point out at this time is that there is some doubt as to whether Congress can create a property right, and considering for the purposes of argument only that it can, nevertheless the Treasury Department could do so only in the event that Congress had determined a policy within the framework of which the authority to make a regulation creating such a property right in the bond was included.

A vital and important principle involved in this controversy grows out of the dangerously increasing tendency in this country toward government by bureaucracy, which does not represent the will of the people and is a dangerous foe of democratic principles. The judiciary of this nation is the last bulwark of democracy and must zealously guard the principles of constitutional government.

Hence this court does not desire to render a decision creating as a precedent the principle that a governmental department or bureau can, at any time or under any conditions, create a property right through its regulations and in derogation of the rights of citizens of sovereign States under the laws of those sovereignties.

But, as was said in *Matter of International Association of Machinists* v. *Stearns & Co.* (178 Misc. 661 at p. 664): "The economic policy of the nation in the employment of the military and naval forces of the United States and the resources of the government to carry on the war must inevitably differ radically from an economic policy that is adequate and desirable under our concept of democracy in time of peace. In time of war the construction of peacetime statutes, contractual relations and individual liberties must be subjected to such changes and modifications as are the natural offspring of national emergency and necessity. Inherent in the power to create are the elements to destroy. Congress has the power to declare war, and that carried with it as an incident the power to put into effect such procedures as are reasonably adapted to achieve victory."

The constitutional power given to the United States to declare war and wage war, whether foreign or civil, carries with it the authority to use all means calculated to weaken the enemy and bring the struggle to a successful conclusion.

It was said in *Miller* v. *United States* (11 Wall. 268, 305): "Of course the power to declare war involves the power to prosecute it by all means and in any manner in which war may be legitimately prosecuted."

In *Northern Pacific Ry. Co.* v. *North Dakota* (250 U. S. 135, at p. 149) is found the following: "The complete and undivided character of the war power of the United States is not disputable. *Selective Draft Law Cases,* 245 U. S. 366; *Ex parte Milligan,* 4 Wall. 2; *Legal Tender Cases,* 12 Wall. 457; *Stewart* v. *Kahn,* 11 Wall. 493. On the face of the statutes it is manifest that they were in terms based upon the war power, since the authority they gave arose only because of the existence of war, and the right to exert such authority was to cease upon the war's termination. To interpret, therefore, the exercise of the power by a presumption of the continuance of a state power limiting and controlling the national authority was but to deny its existence. It was akin to the contention that the supreme right to raise armies and use them in case of war did not extend to directing where and when they should be used. *Cox* v. *Wood,* 247 U. S. 3."

Congress has the authority to raise an army and navy to prosecute the war. This can not be done without the aid of finances. It is vital. Nothing should be done that will in any manner hamper the raising of necessary funds to prosecute the war. Although the Treasury Department has assumed that

Congress gave it the broad power it is invoking, one cannot doubt that Congress in the interests of a speedy and efficient prosecution of the war intended to grant the authority to the Department to go to the great length it has in formulating rules and regulations.

Acting upon this assumption, war bonds have been sold under the representation that a beneficiary could be named in the event of the death of the owner and the obligation would be paid in the manner designated in the bond and the proceeds become the sole property of the beneficiary designated therein. To stand on the formality of requiring further action by Congress to fortify the assumption of the Treasury Department, when the eyes of the nation are firmly fixed on victory, might retard the war effort. And to hold that the government in this crisis has erred in the conception of its rights under the Constitution might leave the impression in the minds of the American public that the government has been guilty of misrepresentation. It might destroy confidence and further retard the war effort whereas all Americans are primarily interested in its acceleration.

Should our enemies be successful in this war, there may be left no individual property rights and no Constitution.

It is therefore decided that the regulation in the savings bonds, permitting the designation of a beneficiary to receive the bond or its proceeds, in the event of the death of the owner, is a constitutional exercise by the United States Government of the power to raise money for the prosecution of a war, and the bonds in question belong to the named beneficiary therein, Theodore Karlinski.

Submit decree.